1
2
3
4
5
6
7

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

8
9

10   KENNETH TAYLOR CURRY,

11                                    Plaintiff,

12              v.

13   JO ANNE B. BARNHART, Commissioner of
      Social Security,

14
15                                    Defendant.

16

CASE NO.    C06-5123FDB-KLS

REPORT AND
RECOMMENDATION

Noted for November 3, 2006

17        Plaintiff, Kenneth Taylor Curry, has brought this matter for judicial review of the denial of his

18   applications for disability insurance and supplemental security income ("SSI") benefits.  This matter has

19   been referred to the undersigned Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and Local

20   Magistrates Rule MJR 4(a)(4) and as authorized by Mathews, Secretary of H.E.W. v. Weber, 423 U.S. 261

21   (1976).  After reviewing the parties' briefs and the remaining record, the undersigned submits the following

22   Report and Recommendation for the Honorable Franlin D. Burgess' review.

23                             FACTUAL AND PROCEDURAL HISTORY

24        Plaintiff currently is fifty-eight years old.[1] Tr. 116. He has two years of college education and past

25   work experience as a carpenter. Tr. 20, 199, 204.

26        On November 21, 1980, an administrative law judge ("ALJ") determined plaintiff to be disabled and

27

28        _____

          [1]Plaintiff's date of birth has been redacted in accordance with the General Order of the Court regarding Public Access
     to Electronic Case Files, pursuant to the official policy on privacy adopted by the Judicial Conference of the United States.

REPORT AND RECOMMENDATION
Page - 1

entitled to receive SSI benefits apparently due to one or more mental impairments.[2] Tr. 15, 19.  While not entirely clear from the record, it appears plaintiff continued to receive SSI benefits at least through late October, 1993, at which time, he "created a Plan for Achieving Self-Support ('PASS')." Tr. 15, 121.  His PASS was approved on April 21, 1994, and made effective November 1993, and "with the approval good until April 1, 1995."[3] Tr. 15, 121.

Plaintiff subsequently was found to have failed to comply with his PASS, due to a failure to provide certain information requested by the Commissioner. Tr. 15, 121-25.  He requested reconsideration of the denial, which was denied, and a hearing before an ALJ, which was held on February 22, 1996. Tr. 15, 121. On September 11, 1996, the ALJ issued a decision finding that plaintiff had failed to fully comply with his PASS, but also determining that the PASS should be recalculated based on additional information plaintiff eventually provided. Tr. 15, 121-25.  After plaintiff withdrew his request for review, that decision became the Commissioner's final decision.[4] Tr. 15, 126-27.

On November 23, 1998, plaintiff filed a second application for SSI benefits, which was denied on May 3, 1999.[5] Tr. 15.  No request for reconsideration of that denial was made. Id.  Plaintiff filed a third such application on November 28, 2000, which was denied on December 7, 2000, apparently due to his working and the earnings he received therefrom. Tr. 15, 287.  On December 10, 2001, he protectively filed applications for disability insurance and SSI benefits.[6] Tr. 15.  Both applications were denied initially and on reconsideration, and plaintiff requested a hearing before an ALJ. Tr. 15, 116-17, 131-32, 137.

On November 19, 2002, plaintiff appeared for the hearing without representation, though he was

---

[2]The record does not contain a copy of this determination.

[3]Because "one of the objectives of the SSI program is to help blind or disabled persons become self-supporting," the Commissioner "will pay an individual SSI benefits and will not count the part of the income set aside for use under a "PASS." Tr. 122; see also 20 C.F.R. § 416.1180.

[4]The record is silent as to the fate of plaintiff's PASS.

[5]As noted above, the record also is silent as to exactly how long plaintiff received SSI benefits under his prior application, or when those benefits stopped, although presumably he was no longer receiving them by the time he filed his November 23, 1998 application.

[6]It is unclear on what date plaintiff was claiming he became disabled at that time.  The application plaintiff filed originally stated: "I became unable to work because of my disabling condition on October 1, 2001." Tr. 164.  This, however, has been crossed out, and on the application form is written: "My doctors say that I am disabled since 1977 on or about, and that the condition affect [sic] my ability to work." Id.  On another related document asking him to state when he became unable to work due to his illnesses, injuries or conditions, plaintiff also failed to indicate any specific date. Tr. 198.

advised of his right to have such, before the same ALJ. Tr. 24-39, 131.  On January 29, 2003, the ALJ

issued a decision, finding plaintiff had failed to comply with a scheduled psychological evaluation, and thus

had abandoned his request for a hearing. Tr. 131.  For that reason, the ALJ found the prior reconsideration

determination remained in effect. Id.  On October 20, 2004, the Appeals Council reversed the ALJ's

decision, finding that plaintiff's actions did not constitute a basis for dismissal, and remanded the matter to

the ALJ for a hearing. Tr. 15, 150-51.

      A hearing therefore was held on July 21, 2005, at which plaintiff, unrepresented – though, again, he

was advised of his right to have representation – appeared and testified, as did a vocational expert. Tr. 40-

115.  On November 25, 2005, the ALJ issued a decision, determining plaintiff to be not disabled, finding

specifically in relevant part:

    (1)    at step one of the disability evaluation process,[7] plaintiff had not engaged in
          substantial gainful activity at any time since November 15, 2000;

    (2)    at step two, plaintiff had "severe" impairments consisting of a history of
          laceration to the right neck, a heart condition and hypertension;

    (3)    at step three, none of plaintiff's impairments met or equaled the criteria of any of
          those listed in 20 C.F.R. Part 404, Subpart P, Appendix 1;

    (4)    at step four, plaintiff had the residual functional capacity to perform light
          exertion work, but not heavy manual labor, which precluded him from
          performing his past relevant work; and

    (5)    at step five, plaintiff was capable of performing other jobs existing in significant
          numbers in the national economy.

Tr. 7, 21-22. Plaintiff's request for review was denied by the Appeals Council on January 18, 2006, making

the ALJ's decision the Commissioner's final decision. Tr. 7; 20 C.F.R. § 404.981, § 416.1481.

      On March 7, 2006, plaintiff filed a complaint in this Court seeking review of the ALJ's decision.

(Dkt. #1-#3).  Specifically, plaintiff argues that decision should be reversed and remanded for further

administrative proceedings for the following reasons:

    (a)    the ALJ erred in failing to discuss the issue of plaintiff's mental impairment and
          develop the record further regarding that issue;

    (b)    the ALJ erred in not developing the record further with respect to plaintiff's
          physical impairments; and

---

[7]The Commissioner employs a five-step "sequential evaluation process" to determine whether a claimant is disabled.
See 20 C.F.R. § 404.1520; 20 C.F.R. § 416.920.

1

       (c)      the ALJ erred in finding plaintiff capable of performing other work existing in significant numbers in the national economy.

2

For the reasons set forth below, the undersigned agrees that the ALJ erred in determining plaintiff to be not

3

disabled, and therefore recommends that the ALJ's decision be reversed, and that this matter be remanded

4

to the Commissioner for further administrative proceedings.  While plaintiff requests oral argument in this

5

matter, the undersigned finds such argument to be unnecessary here.

6

DISCUSSION

7

       This Court must uphold the Commissioner's determination that plaintiff is not disabled if the

8

Commissioner applied the proper legal standard and there is substantial evidence in the record as a whole to

9

support the decision.  Hoffman v. Heckler, 785 F.2d 1423, 1425 (9th Cir. 1986).  Substantial evidence is

10

such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  Richardson

11

v. Perales, 402 U.S. 389, 401 (1971); Fife v. Heckler, 767 F.2d 1427, 1429 (9th Cir. 1985).  It is more than

12

a scintilla but less than a preponderance.  Sorenson v. Weinberger, 514 F.2d 1112, 1119 n.10 (9th Cir.

13

1975); Carr v. Sullivan, 772 F. Supp. 522, 524-25 (E.D. Wash. 1991).  If the evidence admits of more than

14

one rational interpretation, the Court must uphold the Commissioner's decision.  Allen v. Heckler, 749 F.2d

15

577, 579 (9th Cir. 1984).

16

I.     The ALJ Erred in Failing to Properly Consider the Evidence in, and to Fully Develop, the Record

17

      Regarding Plaintiff's Mental Condition

18

       As noted above, the record indicates that plaintiff was awarded SSI benefits for a number of years

19

beginning in 1980, due to one or more mental impairments.  While the record fails to indicate exactly what

20

plaintiff's mental condition was at the time that formed the basis for the award of benefits, it does contain

21

three psychological evaluations dated fairly contemporaneously therewith.

22

       In late October 1977, plaintiff was evaluated by Romualdas Kriauciunas, Ph.D., who noted that he

23

"evidenced some obsessive-compulsive, as well as passive-aggressive features," and that he tended to be

24

"generally schizoid." Tr. 261.  Personality testing indicated "a fluctuating grasp and tie with reality." Tr.

25

262.  Dr. Kriauciunas further noted that "[p]erhaps the most outstanding characteristic" was plaintiff's

26

"defensiveness and hesitation to admit to any psychological problems or weaknesses," and that "[n]eedless

27

to say, he would be very resistant to therapeutic change or even the suggestion that he undertake this type

28

of treatment." Id.

Dr. Kriauciunas diagnosed plaintiff with "Schizoid Personality, with passive-aggressive features." Id. He did not recommend psychotherapy at the time because plaintiff was "not in acute distress," and he was "fairly defensive to anything that might have psychological implications for him." Id. Dr. Kriauciunas further recommended that plaintiff receive vocational training "in the business area," even though he might "have difficulty in maintaining his motivation at a high enough and persistent enough level to benefit from prolonged training." Tr. 263.

In early July 1979, plaintiff was evaluated by Mary Jane Keller, Ph.D., who noted plaintiff's "need to impugn the motivation of others, his tendency to expect harsh, cruel, persecutory treatment by others, his emitting of calumnies, and the need to express anxiety and anger in the form of threats concerning litigation." Tr. 267. She found his "needs and affect" demanded "that he be litigious because he cannot feel comfortable with himself when not proving he is 'right.'" Id. Indeed, Dr. Keller found plaintiff's "characteristics" to be "so blatant that any professional (psychologist, rehabilitation counselor, attorney or physician) who did not recognize the nature of the behavior would be naive or ill-informed." Id.

Plaintiff again was evaluated by Dr. Kriaciunas in early August 1979. This time, Dr. Kriaciunas noted that plaintiff tended "to take an adversary stance toward events and people that impact on his present life," and that he continued "to be very defensive, using projection as his primary defense mechanism." Tr. 268. Dr. Kriaciunas concluded as follows:

> This goes together with his ultra-sensitivity in interpersonal relationships and his unconsciously poor self-concept. At the present time, compared to almost two years ago, the client appears to be more bitter, more critical, and less functional. Clinically, we see a mixture of schizoid and paranoid features. However, the client is still not at all interested in any services such as psychotherapy, that would help him to take a closer look at his own contributions to the situations that he finds himself in. Yes, psychotherapy would, in most likelihood, improve his self-concept and may lead to more satisfying interpersonal relationships. At the same time, it is most unlikely that the client would seek such services. Instead, he would tend to misinterpret such a suggestion as an additional burden that is placed on him.

Tr. 268-69.

The only other medical evidence in the record concerning plaintiff's mental condition is a January 13, 2003 consultative psychological evaluation performed by Roderick P. Calkins, Ph.D. In his report, however, Dr. Calkins stated that the evaluation could not be completed due to plaintiff's "refusal to complete the test instruments in an appropriate manner." Tr. 270. Specifically, Dr. Calkins commented in relevant part as follows:

I took pains to establish some rapport with him and allowed him to relate at some length the events surrounding his application for Social Security.  I then attempted to ease into the testing using the Digit Symbol-Coding sub-test of the WAIS-III since it is rather simple and straightforward.  Mr. Curry had problems following instructions on this test. It was clear that he understood instructions at all times.  When asked to complete the items in sequence which is printed on the page, he began skipping around . . . When I corrected him and explained the necessity for completing the instruments in a standard fashion, he began to argue.  His general point was that he felt his approach to the test was more efficient and that to do the test in the standard manner was "stupid" and would would inculcate "bad habits" for him.  After 21 seconds into this test, he refused to go on.  I told him that it was essential that we complete the test in order for him to complete this evaluation.  He reiterated his belief that he should not do something that would create bad habits and said that if he had to do the test the way I was telling him, he would not continue with the evaluation.  I then warned him that the evaluation would be over if he did not complete the tests as instructed.  He refused and left.

Id.  Although Dr. Calkins further commented that "[t]he interchange was actually less acrimonious than might be assumed," he nevertheless concluded by stating that he did "not feel it would be appropriate for" him to schedule another appointment with plaintiff, as he felt his interaction with plaintiff "compromised" his "objectivity in evaluating him further." Tr. 270-71.

Plaintiff asserts the opinions of Dr. Kriaciunas and Dr. Keller constitute evidence of his mental impairment.  He further asserts the record reflects that his mental health problems continue, as evidenced by his failure to cooperate with requests for information or to sign release forms, his failure to cooperate with Dr. Calkins during his most recent psychological evaluation, his uncooperative and threatening behavior in dealing with Social Security Administration employees, and his evasiveness and inability or unwillingness to answer simple questions posed by the ALJ.  Indeed, this behavior is well documented throughout the record. See Tr. 24-115, 131-32, 137, 140, 147-48, 164, 198, 210-11, 213-14, 220-27, 234-41, 246, 250-52, 255, 258, 292-97.

Plaintiff argues that despite this evidence, the ALJ's decision contains no discussion of his mental impairment, and that this error alone requires remand for further proceedings.  It is not entirely true though that the ALJ failed to discuss the issue of mental impairment.  For example, the ALJ did note plaintiff "was granted benefits based on mental impairments in 1980," but had "provided no records showing continued treatment for such conditions covering the period since his alleged onset date through the present." Tr. 19. Such findings, however, hardly constitute a sufficient analysis of the medical evidence that, albeit fairly dated, is in the record regarding plaintiff's mental condition. See Reddick v. Chater, 157 F.3d 715, 722 (9th Cir. 1998) (ALJ's findings must be supported by specific, cogent reasons, which can be shown by giving

1   detailed and thorough summary of facts and evidence, and stating interpretation thereof).

2       Defendant counters that plaintiff simply is trying to re-argue the facts here, which is the province of

3   the ALJ as the fact-finder, and that because the ALJ's interpretation of those facts was reasonable, it must

4   be upheld.  This argument, however, assumes the brief statement offered by the ALJ above constitutes an

5   interpretation of the facts.  It is not clear though that the ALJ even considered the medical opinions of Dr.

6   Kriaciunas and Dr. Keller, as the ALJ only mentions the 1980 disability determination itself, and the fact

7   that plaintiff, for whatever reason, has provided no more recent treatment records.

8       While it certainly can be argued, furthermore, that the opinions of Drs. Kriaciunas and Keller are too

9   old to be particularly relevant, and thus that the ALJ was not required to consider them, the ALJ did rely on

10  a 1977 report from one of plaintiff's physicians to place a limitation on no heavy manual labor due to a right

11  neck laceration. Tr. 19.  This despite a similar lack of more recent medical evidence in the record regarding

12  that limitation.  In other words, if it was reasonable for the ALJ to rely on such an old medical report in

13  making a decision regarding plaintiff's physical limitations, it also should be reasonable to do the same with

14  respect to his mental condition and resulting limitations, if any.

15      In addition, while not necessarily conclusive proof that he continues to suffer from a current mental

16  impairment, it is quite clear from the record there is at least a question as to whether plaintiff does have

17  such an impairment.  The record plainly shows plaintiff's most recent documented behavior shares many of

18  the same characteristics noted by Dr. Kriaciunas and Dr. Keller.  For example, it was noted at the time that

19  plaintiff exhibited passive-aggressive features, tended to be generally schizoid, was fairly defensive and

20  hesitant to any psychological problems or weaknesses.  Also noted was his tendency to take an adversary

21  stance toward events and people that impacted his present life.   Dr. Keller specifically noted his need to

22  impugn the motivation of others, and his tendency to expect harsh, cruel, persecutory treatment by others,

23  and to express anxiety and anger in the form of threats concerning litigation.

24      Plaintiff also argues the ALJ should have further developed the record with respect to his mental

25  impairment.  In so arguing, plaintiff relies on a line of Ninth Circuit cases that hold the ALJ has a "duty to

26  fully and fairly develop the record and to assure that the claimant's interests are considered."[8] Tonapetyan v.

27

28      [8]Plaintiff also urges the Court to consider the Commissioner's Manual on the Social Security Administration Hearings,
    Appeals and Litigation Law ("HALLEX") for guidance in determining whether the ALJ should have developed the record further
    in this case.  The HALLEX, however, "has no legal force," and as such, "does not prescribe substantive rules," "does not carry
    the force and effect of law," and "is not binding" on the Court. Bunnell v. Barnhart, 336 F.3d 1112, 1115 (9th Cir. 2003).

REPORT AND RECOMMENDATION
Page - 7

Halter, 242 F.3d 1144, 1150 (9th Cir. 2001) (citation omitted).  This duty exists whether or not a claimant is represented by counsel. Id.; DeLorme v. Sullivan, 924 F.2d 841, 849 (9th Cir. 1991) (disability hearings are not adversarial in nature, and ALJ has basic duty to inform himself about facts relevant to his decision).  "When the claimant is unrepresented, however, the ALJ must be especially diligent in exploring for all the relevant facts." Tonapetyan, 242 F.3d at 1150.

The "duty to develop the record fully is also heightened where the claimant may be mentally ill and thus unable to protect her own interests." Id.; DeLorme, 924 F.2d at 849 ("In cases of mental impairments, this duty is especially important."); see also Widmark v. Barnhart, 454 F.3d 1063, 1068-69 (9th Cir. 2006) (where claimant is not represented, it is incumbent on ALJ to scrupulously and conscientiously probe into, inquire of, and explore for all relevant facts and to remain especially diligent in ensuring that favorable as well as unfavorable facts and circumstances are elicited) (citing to and quoting from Cox v. Califano, 587 F.2d 988, 991 (9th Cir. 1978))).

"Ambiguous evidence, or the ALJ's own finding that the record is inadequate to allow for proper evaluation of the evidence, trigger's the ALJ's duty to 'conduct an appropriate inquiry.'" Tonapetyan, 242 F.3d at 1150.  Other circumstances, the Ninth Circuit has noted, may trigger this duty as well:

> In some cases, the presence of a non-asserted disability in the record . . . might suffice to trigger the need for additional review even if it is not discernable in person.  In other cases, the presence of a discernable though non-asserted condition . . . may suggest the need for additional review even if it is not noted in the record.  In cases such as the instant one, the combination of a condition's presence in the record and in person trigger a need for review.  In all such cases we ask whether the ALJ has acted reasonably in fulfilling his or her responsibility of scrupulous, conscientious, and diligent inquiry into the facts . . . That we defer to ALJ determinations made on substantial evidence in the record does not excuse the ALJ's obligation to develop the record for both his or her analysis and our review.

Celaya v. Halter, 322 F.3d 1177, 1183 n.3 (9th Cir. 2003).

Here, as discussed above, plaintiff was unrepresented throughout his disability application process, including during the hearings held before the ALJ.  Also as discussed above, it is clear there was at least a question as to the presence of a mental condition at the time of those hearings, given plaintiff's behavior in dealing with both the Social Security Administration and Dr. Calkins, and its similarity to the symptoms noted and diagnoses made by Drs. Kriaciunas and Keller back in 1977 and 1979.  As such, the ALJ's duty

---

Accordingly, the undersigned shall confine its analysis instead to the well-established case law from the Ninth Circuit in this area, and decline to apply the guidelines contained in the HALLEX referred to by plaintiff.

1  to fully and fairly develop the record was heightened.  Given the similarity between plaintiff's more recent

2  behavior and the prior medical evidence in the record, furthermore, the evidence in the record concerning

3  plaintiff's mental condition was far from unambiguous.  Finally, the presence of this discernable, though

4  unasserted, condition in the medical evidence in the record, along with plaintiff's more recent documented

5  behavior, should have suggested to the ALJ the need for further review.[9]

6        Defendant urges this Court to be mindful of the Ninth Circuit's holding in <u>Lewis v. Apfel</u>, 236 F.3d

7  503 (9th Cir. 2001).  In that case, the claimant relied in part on 20 C.F.R. § 404.1527(c)(3) to argue that the

8  ALJ "erred when, after having commented that he had not ruled out the possibility that" the claimant's

9  "impairments met or equaled" an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, the ALJ

10  "did not seek additional medical evidence." <u>Lewis</u>, 236 F.3d at 514.  The Court of Appeals rejected the

11  claimant's reliance on this regulatory section, however, stating as follows:

12        The authorities cited by Lewis are not on point. . . . Section 404.1527(c)(3) of the
      regulations . . . does not apply.  The section provides for gathering additional evidence

13        only if the evidence already present consistently favors the claimant: "[i]f the evidence is
      consistent but we do not have sufficient evidence to decide whether you are disabled, or

14        if after weighing the evidence we decide we cannot reach a conclusion about whether
      you are disabled, we will try to obtain additional evidence."  Here the evidence did not

15        consistently favor a finding of disability.

16  <u>Id.</u> at 514-15.

17        Defendant's reliance on <u>Lewis</u> and 20 C.F.R. § 404.1527(c)(3), however, is misplaced.  Defendant

18  reads <u>Lewis</u> as holding that an ALJ is required to obtain additional evidence <u>only</u> if the evidence already in

19  the record consistently favors the claimant.  If the Court were to adopt such a reading of the Ninth Circuit's

20  holding, however, it would eviscerate the line of cases discussed above, a number of which post-date <u>Lewis</u>,

21  requiring the ALJ to further develop the record where the evidence is ambiguous or there is a "gap" in the

22  record. <u>See</u> <u>Tonapetyan</u>, 242 F.3d at 1150; <u>Widmark</u>, 454 F.3d at 1069.  None of these cases have deemed

23  the presence of consistently favorable evidence to be a prerequisite the claimant must meet before the ALJ

24  is required to fulfill this duty to develop the record.

25

26       [9]The undersigned is aware that, as defendant points out, the ALJ found plaintiff earned in excess of what appear to be

27  substantial gainful activity levels for the years 2000 and 2001, and that plaintiff has not challenged that finding. <u>See</u> Tr. 16-17,185.  While certainly those earnings constitute evidence that contradicts plaintiff's allegations of inability to work during this period, the ALJ expressly found his earnings for the years 2002 through 2004 did not rise to these levels. Tr. 17.  Thus, issues

28  still remain with respect to what effect, if any, plaintiff's mental condition and potential limitations stemming therefrom had on his ability to work when he was not earning at the substantial gainful activity level.

1    Rather, Lewis must be read to mean that before a claimant can rely on 20 C.F.R. § 404.1527(c)(3)

2    to require an ALJ to gather additional evidence, the evidence that is already contained in the record must

3    consistently favor the claimant.  Otherwise, if the evidence already in the record does not consistently favor

4    him or her, the claimant still may argue that such additional evidence should have been obtained under the

5    ALJ's more general duty to develop the record.  Here, plaintiff did not rely on 20 C.F.R. § 404.1527(c)(3)

6    to argue that the ALJ should have obtained additional evidence regarding his mental condition.  Instead, as

7    discussed above, he properly argued that the opinions of Drs. Kriaciunas and Keller regarding his mental

8    condition, his behavior in dealing with the ALJ and the Social Security Administration, and his status as an

9    unrepresented claimant, should have triggered the ALJ's duty to further develop the record.

10    The undersigned is not unmindful of the burden placed on the ALJ when faced with a claimant who

11    refuses to cooperate or cooperate fully in obtaining his or her own medical records or in complying with a

12    consultative evaluation.  The undersigned also recognizes plaintiff "is ultimately responsible for providing

13    the evidence to be used in" determining his disability.  Widmark, 454 F.3d at 1068; 20 C.F.R. § 404.1512.

14    However, as discussed above, it is clear plaintiff's failure to cooperate in obtaining his medical records and

15    cooperate with Dr. Calkins may very well have been due to his mental condition.

16    The ALJ, furthermore, has options other than merely sending plaintiff back to Dr. Calkins or for

17    another consultative evaluation involving psychological testing to which plaintiff appears to be adverse.  For

18    example, the ALJ could re-contact Dr. Calkins for his opinion regarding plaintiff's behavior during the

19    January 13, 2003 psychological testing, notwithstanding the fact that such testing had to be prematurely

20    ended due to such behavior.  See id.  The ALJ also could send plaintiff to a psychiatrist for evaluation or call

21    a medical expert to testify at a supplemental hearing regarding such additional psychiatric evaluation and/or

22    that evidence, medical and otherwise, already contained in the record.  See 20 C.F.R. § 404.1512(e); 20

23    C.F.R. § 404.1527(f)(2)(iii).  What is clear though is that on remand the ALJ must make all reasonable

24    efforts to fully and fairly develop the record and obtain further evidence with respect to plaintiff's mental

25    condition as outlined herein.

26    II.    The ALJ Was Not Required to Further Develop the Record With Respect to Plaintiff's Physical
       Impairments

27

28    Plaintiff argues that in light of his testimony that he had back, arm and heart impairments, and his

       request for a physical consultative examination, the ALJ should have scheduled such an examination for

1   him.  In refusing to do so, plaintiff asserts, the ALJ failed in his duty to fully and fairly develop the record

2   regarding his physical impairments.  The undersigned disagrees.

3          Unlike with respect to plaintiff's mental condition, the medical evidence in the record concerning his

4   physical impairments is fairly unambiguous.  Although the record contains only two medical reports, neither

5   of those reports indicate the presence of a disabling condition.  For example, plaintiff underwent a physical

6   examination in late October 1977.  He reported that he had sustained a laceration to his right neck from a

7   knife in November 1969. Tr. 264.  He further reported, however, that he felt there had been "partial

8   improvement in strength and sensation over the years," and that he was "not particularly limited in daily

9   living activities, nor was "pain a major problem." Id.  "From a functional standpoint," he felt "he would be

10  limited" only "if he had to do heavy work such as construction or manual labor of any sort." Id.

11         The examining physician noted plaintiff "to be in good health" and "no apparent distress" at the

12  time. Id.  There was "some asymmetry of the neck and shoulder" with "reduction in muscle bulk," his

13  posture was "slightly asymmetrical," and there was some right muscle weakness, as well as "somewhat less

14  active" right deep tendon reflexes and "subjective blunting" of sensation. Tr. 264-65.  Plaintiff's extremity

15  muscles, however, all exhibited normal strength. Tr. 265.  Plaintiff was diagnosed with "loss of muscle bulk

16  for theneck [sic] muscles." Id.  His "deficits" though were noted to be "minimal from a functional

17  standpoint." Id.  The following recommendations also were made:

18         1. As far as medical management is concerned, I see nothing further that could or
           should be offered.  It is likely he is going to have some life-long impairment from the
19         injury, but fortunately it does not appear to affect him functionally to a significant
           degree.
20
           2. As far as vocation is concerned, there are no particular medical restrictions which
21         need to be established and I believe this does come down to a question of common sense
           and the patient's own subjective impression of what he can tolerate and what he cannot
22         tolerate.  I recognize that it is very difficult to be objective in these circumstances and it
           does open up the possibility for malingering, but I would still suggest that you counsel
23         him away from activities which primarily depend upon heavy manual labor or repetitive
           use of the arm in an overhead position.  With those exceptions, I find no medical
24         evidence today that he would be unable to participate in any of a wide category of
           occupations which would require minimal or moderate physical exertion or which would
25         primarily involve desk work.

26  Id.

27         The only other medical report in the record regarding plaintiff's physical impairments is a letter from

28  Dr. Richard A. Kirkpatrick, dated February 3, 2005.  In that letter, Dr. Kirkpatrick informed plaintiff that

1  electrodiagnostic testing revealed "very small leaks of three valves, and a slightly larger leak of the fourth"

2  in his heart. Tr. 272.  However, Dr. Kirkpatrick stated that "[o]nly the aortic valve lesion" was "of

3  concern," and that it "should be rechecked in a year." Id.

4          Dr. Kirkpatrick further informed plaintiff that he found "left ventricular hypertrophy," which he said

5  "could deteriorate into a significant problem five to ten years from now." Id.  The "most important finding"

6  though, according to Dr. Kirkpatrick, was "the presence of fluid in the sac around the heart," which he

7  stated could "cause sharp, stabbing chest pains and shortness of breath," the "usual treatment" for which

8  was anti-inflammatories that could be prescribed for him. Id.

9          Neither of these physicians, however, opined that plaintiff was anywhere near disabled.  Indeed, as

10  noted above, plaintiff's back and arm impairments were found to not prevent him from participating in a

11  wide category of occupations requiring minimal or moderate physical exertion or which primarily involved

12  desk work.  In addition, while Dr. Kirkpatrick opined that some of plaintiff's heart problems could cause

13  him significant problems in the future, he gave no indication that such was the case at the time he evaluated

14  plaintiff.  Nor did plaintiff provide any further medical documentation regarding his allegedly disabling

15  physical impairments, despite repeated requests and opportunities for him to supplement the record. See Tr.

16  110-15, 132, 137, 221-22, 224-25, 252, 255.[10]  Even so, the ALJ gave plaintiff the benefit of the doubt and

17  relied on these two medical opinions in restricting him to light exertion work. Tr. 19.

18  III.    The ALJ's Step Five Findings

19          If a claimant cannot perform his or her past relevant work, at step five of the disability evaluation

20  process the ALJ must show there are a significant number of jobs in the national economy the claimant is

21  able to do. Tackett v. Apfel, 180 F.3d 1094, 1098-99 (9th Cir. 1999); 20 C.F.R. § 404.1520(d), (e), §

22  416.920(d), (e).  The ALJ can do this through the testimony of a vocational expert or by reference to the

23  Commissioner's Medical-Vocational Guidelines (the "Grids"). Tackett, 180 F.3d at 1100-1101; Osenbrock

24  v. Apfel, 240 F.3d 1157, 1162 (9th Cir. 2000).

25          Here, the vocational expert testified that plaintiff had "transferable skills in the area to return to

26  work from his carpentry background as a union person to an estimator." Tr. 106.  Based on this testimony,

27

28          [10]While plaintiff has stated in his pleadings at the administrative review level that no such records were ever sought, the
evidence in the record clearly indicates otherwise.

1  the ALJ found plaintiff capable of performing the job of carpentry estimator. Tr. 20.  Plaintiff argues that

2  because the job of estimator is defined by the DOT as being a skilled job, the ALJ was required to identify

3  the specific skills that are transferable to that position.  Because the ALJ did not do so here, plaintiff asserts,

4  he erred.  The undersigned agrees.

5       Pursuant to Social Security Ruling ("SSR") 82-41, "[w]hen a finding is made that a claimant has

6  transferable skills, the acquired work skills must be identified, and specific occupations to which the

7  acquired work skills are transferrable must be cited" in the ALJ's decision. Id., 1982 WL 31389 *7.  Here,

8  the ALJ did cite a specific occupation, i.e., a carpentry estimator.  However, it is not clear that this finding

9  comports with the testimony of the vocational expert.

10      It is true that, as noted above, the vocational expert testified that plaintiff had transferrable skills

11  from his carpentry background to the job of estimator.  Notably though, the vocational expert did not say

12  "carpentry" estimator.  While certainly it may be reasonable to assume this was the vocational expert's

13  intent, the Dictionary of Occupational Titles ("DOT") job description the vocational expert cited to appears

14  to be that of a general "estimator."  See Tr. 106; DOT 169.267-038.  That description, however, makes no

15  reference to skills that are specific solely to carpenters.  Indeed, the jobs of carpenter and estimator belong

16  to separate and distinct occupational groups within the DOT.  See DOT 860.381-022.

17      In addition, the undersigned finds the ALJ erred in failing to identify "in detail the types of skills" he

18  "found to be transferrable." Botefur v. Heckler, 612 F.Supp. 973, 976 (D.Or. 1985).  The undersigned,

19  furthermore, disagrees with defendant that such error was harmless.  First, it is not at all clear that those

20  skills that plaintiff acquired as a carpenter, whatever they may be, are, as discussed above, transferrable to

21  the job of general estimator.  Nor is it clear that the job of carpenter necessarily encompasses within it the

22  skills needed to perform the job of estimator, both because of the above and because each job is defined by

23  the DOT as requiring the same high level of specific vocational preparation.[11]

24      Finally, it does not appear, as defendant argues, that applying harmless error here is appropriate.  It

25  is true that "[h]armless error applies in the Social Security context." Stout v. Comm'r, Soc. Sec. Admin.,

---

27  [11]Specific vocational preparation is defined by the DOT as "the amount of lapsed time required by a typical worker to

28  learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation." DOT, Appendix C. There are nine levels of specific vocational preparation (levels 1 through 9), with level 1 being the shortest and level 9 being the longest.  The DOT defines the jobs of carpenter and estimator as both requiring a specific vocational preparation level of 7 ("[o]ver 2 years up to and including 4 years"). DOT 169.267-038; DOT 860.381-022.

REPORT AND RECOMMENDATION
Page - 13

1   454 F.3d 1050, 1054 (9th Cir. 2006); Burch v. Barnhart, 400 F.3d 676, 679 (9th Cir. 2005) (decision of ALJ

2   will not be reversed for errors that are harmless).  Harmless error though generally has been applied only

3   when the ALJ's error "was inconsequential to the ultimate nondisability determination." Stout, 454 F.3d at

4   1055 (noting that harmless error applied where error was non-prejudicial to claimant or irrelevant to ALJ's

5   ultimate disability conclusion, and where it occurred during procedure or step ALJ was not required to

6   perform); but see Batson v. Comm'r of Soc. Sec. Admin., 359 F.3d 1190, 1195-97 (9th Cir. 2004) (applying

7   harmless error where ALJ expressly discredited claimant's testimony, but erred in doing so).[12]

8           In this case, the ALJ's error in failing to identify the specific transferrable work skills plaintiff had

9   acquired from his carpentry background hardly could be said to have been non-prejudicial to him or to be

10  inconsequential to the ALJ's ultimate disability determination.  That is, because skill transferability was

11  essential to the ALJ's finding at step five of the disability evaluation process that plaintiff was capable of

12  performing the job of carpentry estimator, and thus his ultimate conclusion that plaintiff was not disabled,

13  the error was far from irrelevant to plaintiff's disability claim.  On remand, therefore, the ALJ should make a

14  new determination regarding plaintiff's specific transferable skills and the specific jobs those skills are

15  transferable to in accordance with SSR 82-41 and the findings contained herein.

16  IV.    This Matter Should Be Remanded for Further Administrative Proceedings

17          The Court may remand this case "either for additional evidence and findings or to award benefits."

18  Smolen v. Chater, 80 F.3d 1273, 1292 (9th Cir. 1996).  Generally, when the Court reverses an ALJ's

19  decision, "the proper course, except in rare circumstances, is to remand to the agency for additional

20  investigation or explanation." Benecke v. Barnhart, 379 F.3d 587, 595 (9th Cir. 2004) (citations omitted).

21  Thus, it is "the unusual case in which it is clear from the record that the claimant is unable to perform

22  gainful employment in the national economy," that "remand for an immediate award of benefits is

23  appropriate." Id.

24          Benefits may be awarded where "the record has been fully developed" and "further administrative

25  proceedings would serve no useful purpose." Smolen, 80 F.3d at 1292; Holohan v. Massanari, 246 F.3d

26  1195, 1210 (9th Cir. 2001).  Specifically, benefits should be awarded where:

27

28          [12]In Batson, however, the Ninth Circuit "did so because the ALJ provided numerous other record-supported reasons for
    discrediting the claimant's testimony, which allowed" its "review to determine the ALJ's errors did not materially impact his
    decision." Stout, 454 F.3d at 1055.

REPORT AND RECOMMENDATION
Page - 14

(1) the ALJ has failed to provide legally sufficient reasons for rejecting [the claimant's] evidence, (2) there are no outstanding issues that must be resolved before a determination of disability can be made, and (3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited.

Smolen, 80 F.3d 1273 at 1292; McCartey v. Massanari, 298 F.3d 1072, 1076-77 (9th Cir. 2002).  Here, as discussed above, issues still remain with respect to plaintiff's mental condition, its effect, if any, on his residual functional capacity and ability to work, and the transferability of those specific skills he acquired from his past relevant work as a carpenter to other jobs.

CONCLUSION

Based on the foregoing discussion, the Court should find the ALJ improperly concluded plaintiff was not disabled, and should reverse the ALJ's decision and remand this matter to the Commissioner for further administrative proceedings in accordance with the findings contained herein.

Pursuant to 28 U.S.C. § 636(b)(1) and Federal Rule of Civil Procedure ("Fed. R. Civ. P.") 72(b), the parties shall have ten (10) days from service of this Report and Recommendation to file written objections thereto. See also Fed. R. Civ. P. 6.  Failure to file objections will result in a waiver of those objections for purposes of appeal. Thomas v. Arn, 474 U.S. 140 (1985).  Accommodating the time limit imposed by Fed. R. Civ. P. 72(b), the clerk is directed set this matter for consideration on **November 3, 2006**, as noted in the caption.

DATED this 11th day of October, 2006.

Karen L. Strombom
United States Magistrate Judge